O

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV 2 0 2012

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>         v.<br><br>$1,026,781.61 IN FUNDS FROM FLORIDA CAPITAL BANK,<br><br>         Defendant. | Case No. SACV 09-04381-MLG<br>and related case,<br>Case No. SACV 09-00716-MLG<br><br>MEMORANDUM OPINION AND ORDER<br>GRANTING CLAIMANTS'<br>MOTION FOR SUMMARY JUDGMENT |

## I.   Background

### A.   Procedural History

On November 6, 2008, the United States of America ("Plaintiff" or the "Government") seized $1,026,781.61 in funds from a Florida Capital Bank Account belonging to Lonnie Kocontes ("Kocontes"). The Government instituted these civil forfeiture proceedings on June 18, 2009, pursuant to 18 U.S.C. § 981(a)(1)(A),(c). Claimants Kocontes and Katherine Kern (collectively "Claimants") seek return of the funds and real property[1] that were seized.

---

[1] The real property was seized in related case *United States v. Real Property in Safety Harbor, Florida,* Case No. SACV 09-0716-MLG (C.D. Cal. 2009), filed on June 17, 2009. These cases have been consolidated.

Claimants first filed a motion for summary judgment on August 8, 2011, based solely on the argument that the Government did not have probable cause to institute civil forfeiture proceedings at the time the action was initiated. On October 25, 2011, District Judge James V. Selna denied the motion. The parties subsequently consented to the exercise of jurisdiction by this United States Magistrate Judge. 28 U.S.C. § 636(c).

Currently before the Court is Claimants' second motion for summary judgment, which was filed on June 24, 2012, with supporting declarations and exhibits. On September 25, 2012, the Government filed an opposition to the motion with supporting documents, as well as a statement of uncontroverted facts. Claimants filed a reply on October 4, 2012. Both parties also filed various motions addressing evidentiary objections. The Court heard oral argument on October 18, 2012, and took the matter under submission.[2] The matter is now ready for decision.

**B.    Factual Background[3]**

These proceedings relate to the Government's claim that Lonnie Kocontes murdered Micki Kanesaki during a Mediterranean cruise the couple took in May 2006. Kocontes, an attorney, and Kanesaki, a legal assistant, met while working at the same law firm in the early 1990s. They married in 1995. In 2000, the couple filed for divorce, apparently to protect assets from the reach of a potential judgment in a civil lawsuit filed against Kocontes. The two continued to live together as a couple. At the same time, Kocontes and Kanesaki's relationship began

---

[2] Claimants have also moved for sanctions based on the Government's alleged discovery abuses. The Court heard oral argument on this issue on October 30, 2012. The question of sanctions is not addressed in the present Memorandum Opinion and Order.

[3] Unless otherwise noted, the facts are undisputed.

to deteriorate. On several occasions, local law enforcement was called to the residence after altercations in which Kanesaki became physically abusive towards Kocontes. Following one of these incidents, Kanesaki was arrested and charged with battery. She eventually attended a court-ordered domestic violence program, and the charges were dropped.

Kocontes and Kanesaki separated in 2005. Shortly thereafter, Kocontes married another woman, but filed for divorce after only two months. In the fall of 2005, Kocontes and Kanesaki reconciled and began to attend counseling together. In November 2005, Kanesaki and Kocontes each executed a will naming the other as the sole beneficiary. Kanesaki was again arrested for battery upon Kocontes in January 2006. After this incident, she enrolled herself in anger management classes and attended Alcoholics Anonymous sessions.

In early May 2006, Kocontes booked a Mediterranean cruise for the couple. On May 23, 2006, they boarded the cruise ship in Spain. On the evening of May 25, 2006, as the ship traveled towards Naples, Kocontes and Kanesaki went to dinner and ordered a bottle of wine. They each drank one glass of wine with dinner, and took the rest of the bottle with them when they finished dinner. They stopped at the ship's casino and then went to a theater show. They returned to their cabin shortly before midnight, where they finished the bottle of wine, each having about one glass each. Kocontes took Ambien, a sleeping pill.

In a declaration submitted with Claimants' motion for summary judgment ("Kocontes Decl."), Kocontes states that he recalls Kanesaki saying that she was stepping out to get a cup of tea sometime between midnight and 1:00 a.m. He claims this was the last time he saw her alive, and that at about 4:30 a.m. on May 26, 2006, he awoke to discover that Kanesaki's bed had not been slept in and she was not in

3

the cabin. Kocontes then notified ship officials that she was missing. Kanesaki could not be found on the ship.

Kocontes was interviewed by ship personnel, and then in Naples by Italian law enforcement officials. Kocontes left the ship the same day and went to stay at a local hotel to wait for developments in the search for Kanesaki. That evening, he received a telephone call from an American consulate official, who advised him that the search for Kanesaki had ended for the day and would resume the following day, but that there was no chance she would be found alive after being in the water for more than 24 hours. Kocontes took a flight back to California on the morning of May 27, 2006. Kanesaki's body was found by the Italian Coast Guard on May 28, 2006.

An autopsy was performed in Italy on June 7, 2006, by Dr. Pietrantonio Ricci. (Report of Dean A. Hawley, M.D. ("Hawley Decl.") at 1-3; Declaration of Terri L. Haddix ("Haddix Decl.") at 2.) Dr. Ricci came to the conclusion that Kanesaki died by strangulation in a homicidal assault. (Hawley Decl. at 3-4; Haddix Decl. at 2-3.)

The FBI began an investigation into Kanesaki's death, and among other things, conducted two interviews of Kocontes. A federal grand jury investigation was convened in this district court in December 2006 for the purpose of investigating Kanesaki's death. No indictment was issued.

As a direct result of Kanesaki's death, Kocontes received a total of between $450,000 and $500,000 from the following sources: (1) $318,707.93 from Kanesaki's half interest in their home, which was sold in January of 2007, and was the only asset to pass through probate; (2) approximately $60,000 from Kanesaki's Vanguard retirement account on which Kocontes was named the beneficiary in the 1990s; (3)

4

approximately $40,000 from an account of Kanesaki's on which Kocontes was listed as the "payable on death" recipient; (4) between $50,000 and $100,000 in assets owned by Kanesaki from joint brokerage accounts; and (5) $10,000 in savings bonds purchased by Kanesaki on which Kocontes was the beneficiary. In 2008, Kocontes filed amended federal tax returns and paid additional taxes for the years 2002-2005 to correct several errors. The IRS eventually refunded $14,091.54 as an overpayment in the form of a check dated May 30, 2008, made out to both Kanesaki and Kocontes. Kocontes endorsed the check for both of them in order to deposit the refund.

By January 2008, Kocontes had remarried and had created a foreign trust for his new wife, Claimant Katherine Kern. Kocontes consolidated most of his liquid assets and wire-transferred them to Belize into the foreign trust. Later that year Kocontes closed the foreign trust account and deposited these funds into his Florida Capital Bank account. On November 6, 2008, the Government seized all of the funds ($1,276,781.61) in the Florida Capital Bank Account. The Government subsequently returned $250,000.

## II.   Standard of Review

Summary judgment is appropriate when, after reviewing the record in the light most favorable to the nonmoving party, the Court determines that "there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir. 2004). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law.

5

*Anderson*, 477 U.S. at 248. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citations omitted). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by citing particular parts of materials in the records or showing that an adverse party cannot produce admissible evidence to support the fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)(1)(B). If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 322-23. If the nonmoving party produces such evidence, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

However, in order to demonstrate the existence of a material issue of fact and defeat a motion for summary judgment, the non-moving party must do more than simply present bald assertions or a "scintilla of evidence." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011)(citing *Anderson*, 477 U.S. at 252); *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[M]ere

1 allegation and speculation do not create a factual dispute for purposes
2 of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82
3 (9th Cir. 1996); *see also Angle v. Miller*, 673 F.3d 1122, 1134 n.6 (9th
4 Cir. 2012); *Endsley v. Luna*, 750 F.Supp.2d 1074, 1101 (C.D. Cal. 2010).

6 **III. Discussion**
7     **A. The Civil Asset Forfeiture Reform Act**
8     This case is governed by the Civil Asset Forfeiture Reform Act of
9 2000 ("CAFRA"), Pub.L. No. 106-185, 114 Stat. 202 (2000). Congress
10 passed CAFRA to transfer the burden of proof to the government in civil
11 forfeiture actions and to require the government to establish the
12 grounds for forfeiture by a preponderance of the evidence, rather than
13 by the lower probable cause standard that was in place prior to the
14 enactment of the statute. *United States v. $80,180.00 in U.S. Currency*,
15 303 F.3d 1182, 1184 (9th Cir. 2002); 18 U.S.C. § 983(c)(1) ("[T]he
16 burden of proof is on the Government to establish, by a preponderance
17 of the evidence, that the property is subject to forfeiture").

18     The Government argues that the property seized from Claimants is
19 subject to forfeiture under 18 U.S.C. § 981(a)(1)(c) because it was
20 derived from proceeds traceable to the murder of Kanesaki by Kocontes.
21 (Complaint at 6-7). In light of CAFRA, it would be the Government's
22 burden at trial to demonstrate by a preponderance of the evidence that
23 Kocontes murdered Kanesaki and that the property seized was
24 substantially connected to the murder.

25     **B. A Genuine Issue of Material Fact Exists as to Whether Kanesaki**
26         **Was the Victim of a Homicide**
27     In their Motion for Summary Judgment, Claimants contend that the
28 Government has not offered admissible evidence that Kanesaki was the

victim of a homicide. (Am. Mem. in Supp. of Summ. J. at 13.) Claimants
argue that the findings from the autopsy performed by Italian
authorities after Kanesaki's death are inadmissible because the
Government produced only English summaries of the findings to
Claimants, rather than detailed translations. (*Id.*) Additionally,
Claimants argue that the autopsy findings cannot be considered because
they have not been properly authenticated. (*Id.* at 14.) Claimants
further claim that even if the autopsy findings were admissible, the
findings are flawed and should not be relied upon to determine
Kanesaki's cause of death. (*Id.* at 14-15.) In support of this
contention, Claimants rely on the opinions of three experts who
reviewed the autopsy findings after Claimants obtained a copy of the
autopsy findings from Italy and had them translated. (*Id.*)

At the summary judgment phase, a court may consider evidence that
is inadmissible in form, so long as its contents can be presented in
admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036
(9th Cir. 2003); Fed. R. Civ. P. 56(c). While the autopsy findings in
their current form contain inadmissible hearsay, their contents could
be admissible at trial if properly authenticated, for example through
the testimony of the Italian physician who performed the autopsy, and
the Government has indicated that it intends to properly authenticate
them at trial. Additionally, the failure of the Government to provide
detailed translations of the autopsy findings to Claimants does not
render them inadmissible at trial, as the Government was under no
obligation to produce such translations. *See, e.g, E&J Gallo Winery v.
Cantine Rallo, S.p.A.,* No. 1:04cv5153, 2006 WL 3251830, at *5 (E.D. Cal
Nov. 8, 2006) ("Normally, in responding to a request for production of
documents, the requesting party would bear the cost of translating

documents written in a foreign language."). Accordingly, the Court will consider the autopsy findings for purposes of this summary judgment motion.

As to the cause of Kanesaki's death, the Government has produced a declaration from expert witness Dr. Dean Hawley, who reviewed both the Italian autopsy findings and the reports of Claimants' experts. (Opp. at 19; Hawley Decl.). In his declaration, Dr. Hawley states that the likely cause of Kanesaki's death was strangulation, and that the findings of Claimants' experts to the contrary were incorrect. (Hawley Decl. at 16.) The autopsy report and the declaration of Dr. Hawley create a genuine issue of material fact as to whether Kanesaki was the victim of a homicide.

## C. There is No Genuine Issue of Material Fact as to Whether Kocontes Murdered Kanesaki

Through Kocontes's declaration, Claimants offer direct evidence that Kocontes did not murder Kanesaki. Kocontes states in his declaration that the last time he saw Kanesaki alive was sometime between midnight and 1:00 a.m the morning of May 26, 2006, and that he subsequently fell asleep and awoke around 4:30 a.m. to discover that she was missing. (Kocontes Decl. at 8.)

There is no direct evidence that Kocontes murdered Kanesaki. However, in its opposition, the Government relies on the following circumstantial evidence to support its allegation that Kocontes murdered Kanesaki: 1) Kocontes and Kanesaki's history of marital discord; 2) statistical evidence that the most prevalent form of female homicide is homicide committed by an intimate partner; 3) Kocontes's presence "at the scene of the crime"; 4) statements made by Kocontes to investigators that were inconsistent with the autopsy findings; and

5) Kocontes's financial motive for murder. (Opp. at 16-17.) Each factual allegation will be addressed in turn to determine whether it creates a genuine issue of material fact on the relevant issue.

### 1. Kocontes and Kanesaki's History of Marital Discord

As noted above, the following is undisputed: Kocontes and Kanesaki were married in 1995 and then divorced in 2001. The divorce was allegedly obtained in order to protect certain assets from potential civil litigation against Kocontes, and Kocontes and Kanesaki continued to live together as a couple. (Pl.'s Statement of Genuine Issues, No. 17.) Nevertheless, their relationship deteriorated and on several occasions, local law enforcement officers were called to the couple's residence due to altercations in which Kanesaki became physically abusive towards Kocontes. (*Id.*, No. 18.) One of the incidents resulted in Kanesaki being arrested and charged with corporal injury and battery upon Kocontes. (*Id.*) Kanesaki eventually attended a court-ordered domestic violence program, in which Kocontes participated. (*Id.*, No. 20.) The couple then separated in 2005, and Kocontes married another woman, but then filed for divorce two months later. (*Id.*, No 22.) In the fall of 2005, Kocontes and Kanesaki reconciled and renewed their relationship. (*Id.*, No. 23.) In January 2006, Kanesaki was agin arrested for battery upon Kocontes. (*Id.*, No 25.)

In their Motion for Summary Judgment, Claimants argue that the couple's marital discord does not in any way suggest that Kocontes murdered Kanesaki. (Am. Mem. in Supp. of Summ. J. at 22.) Indeed, Claimants' contend, and the record shows, that there is no evidence that Kocontes was ever physically abusive towards Kanesaki. Nor is there evidence that he ever threatened to harm her. Rather, as the Government acknowledges, it is undisputed that it was Kanesaki who

became physically violent towards Kocontes during the couple's infrequent altercations. Absent any evidence suggesting that Kocontes had used or threatened to use violence against Kanesaki, the mere fact that the couple had a troubled relationship does not provide circumstantial evidence giving rise to an inference that Kocontes murdered Kanesaki.

### 2. Statistical Evidence

The Government offers statistical evidence regarding intimate partner homicides as circumstantial evidence supporting its allegation that Kocontes murdered Kanesaki. (Opp. at 15-16, Exs. H, I; Report of Donald G. Dutton ("Dutton Decl").) Specifically, the evidence includes: 1) remarks made by Attorney General Eric Holder at a domestic violence awareness event; 2) homicide data collected by the FBI for the year 2009; and 3) the declaration of Donald G. Dutton, Ph.D., a psychologist with a specialty in the psychological and social causes of violence and domestic abuse. Dr. Dutton was asked to provide an opinion on the death of Kanesaki, and reviewed various documents relevant to this case. From his review of the case material and general research on domestic violence, he reached the following conclusions: 1) intimate partner homicides are the most common type of murders of women; 2) typically, a history of domestic violence precedes the intimate partner homicide; 3) intimate partner homicide is sometimes committed for financial gain; and 4) men who murder intimate partners for financial gain tend to have antisocial personalities. (Dutton Decl. at 6.) The Government has stated that Dr. Dutton would be available to testify concerning these conclusions at trial in the present case.[4]

---

[4] The Government has not explained how Attorney General Holder's remarks or the FBI homicide data would be admissible at trial.

Even assuming that this statistical information would be admissible at trial,[5] it does not constitute circumstantial evidence supporting the Government's allegations that Kocontes murdered Kanesaki. Much of the statistical information is focused on circumstances where an intimate partner homicide is preceded by a history of domestic violence perpetrated by the killer against the victim. For example, Dr. Dutton states that he has experience as a therapist of "wife assaulters," and discusses domestic abuse perpetrated by the partner who commits the homicide. (Dutton Decl. at 1-4.) Here, in contrast, it is undisputed that the domestic altercations requiring the presence of local law enforcement were the result of Kanesaki assaulting Kocontes. (Pl.'s Statement of Genuine Issues, Nos. 18, 25.) As discussed previously, there is no evidence that Kocontes ever threatened or physically assaulted Kanesaki. Thus, the statistical information about the relevance of past domestic abuse in cases of intimate partner homicide has no bearing on the factual circumstances present here, where it was the victim of the homicide who had committed past acts of physical abuse.

Moreover, some of the statistical information contained in Dr. Dutton's report appears to undermine the Government's argument in opposition to summary judgment. Dr. Dutton identifies studies showing that strangulation is *not* the most common method of intimate partner killing. (Dutton Decl. at 19.) He also implies that financial gain is not a frequent motive behind intimate partner killings, compared to

---

[5] While unnecessary to decide here, it is questionable whether such statistical evidence would be deemed admissible in light of Fed. R. Evid. 702 and Fed. R. Evid. 403. Suffice it to say that all of the cases the Government cites in support of its assertion that such statistical evidence is admissible in this context are inapposite.

1   other motives such as estrangement or fear the partner is being
2   unfaithful. (Dutton Decl. at 19, 21.) This information is inconsistent
3   with the Government's allegations that Kocontes strangled Kanesaki in
4   order to obtain her assets.

5       Finally, several of Dr. Dutton's conclusions appear wholly
6   speculative. He opines that the likelihood of stranger homicide on the
7   cruise ship is particularly rare because "the cruise ship clientele
8   would be middle class." (Dutton Decl. at 5.) However, there is no
9   evidence in the record regarding the socioeconomic status of the
10  passengers aboard the ship. Even if it can be assumed that the
11  passengers were primarily middle class, there were also 543 crew
12  members on board, whose socio-economic class is not apparent from the
13  record. (Mot. For Summ. J., Ex. S.) Dr. Dutton also opines that if
14  Kanesaki were sexually assaulted and killed by a crew member, then "it
15  would mostly like be a serial rapist/killer and evidence of other
16  deaths (either on other cruises or ashore) should be forthcoming."
17  (Dutton Decl. at 5.) Yet he does not explain his basis for concluding
18  that this hypothetical murderer would be a serial killer. Furthermore,
19  his implication that there should be obvious evidence of the work of
20  a serial killer defies common sense in this context, where there were
21  over 2000 people on the ship and no information is available regarding
22  their histories or whereabouts. Such unsupported speculation and
23  conclusions simply do not provide relevant circumstantial evidence
24  supporting the claim that Kocontes murdered Kanesaki.

25          **3. Presence "At the Scene of the Crime"**
26      The Government asserts that Kocontes was at the scene of the
27  crime—"the cruise ship where Kanesaki met her death." (Opp. at 16.)
28  While it is undisputed that Kocontes was on the cruise ship, Claimants

offer evidence in the form of a declaration by Kocontes stating that he was asleep in his cabin during the time that Kanesaki disappeared, and awoke to find her missing. (Kocontes Decl. at 8.) There is no direct evidence in the record supporting a finding that Kanesaki was murdered in the cabin she was sharing with Kocontes. Indeed, the record includes statements from persons in neighboring cabins who confirm they did not hear or see anything unusual coming from the couple's cabin. (Mot. for Summ. J., Ex. T.)  The record is devoid of any other evidence regarding where on the ship Kanesaki was murdered or that she was thrown overboard in one particular area of the ship as opposed to any other, and the Government acknowledges as much. (Opp. at 18 ("It is entirely possible that the crime occurred anywhere else [besides the couple's cabin] on the ship").) Thus, while Kocontes was at the scene of the crime, defining the scene as the entire cruise ship, so were the more than 2,000 passengers and crew who were also onboard. (Mot. for Summ. J., Ex. S.)    Thus, there is no physical, visual, or aural evidence linking Kocontes to the murder.

### 4. Inconsistent Statements

The Government maintains that Kocontes's statements to authorities that Kanesaki had ingested both alcohol and Ambien just before her disappearance were inconsistent with the autopsy findings, suggesting that Kocontes attempted to mislead law enforcement. (Opp. at 16-17.) Claimants offer compelling evidence that there was nothing inconsistent between Kocontes's statements and the autopsy findings. (Mem. in Supp. of Summ. J. at 15-18.)

The Italian police reports document that Kocontes made the following statement to authorities about Kanesaki's activities the night of her disappearance:

14

1     "Yesterday evening, while still on board, and having
2     prepared ourselves for the evening, we went to dinner and
3     purchased a bottle of wine of which we only drank one glass
4     each. We went back to our cabin where we left the bottle that
5     we had purchased. We first went to the casino of the ship and
6     later to the theater onboard to watch a comedic show. At
7     around midnight we returned to our cabin. Once in the cabin we
8     drank the wine we had purchased earlier, again a glass each.
9     Since we had planned an excursion here in Naples for this
10    morning we decided to take a pill that would help us to fall
11    asleep since we were both suffering from jet lag. We were both
12    having trouble falling asleep. I took my pill and went to bed
13    while my wife went to the bathroom in our cabin to wash off
14    the glasses.
15    - NOTE - *I am unable to say whether or not my wife took her*
16    *pill to fall asleep* because as mentioned, she went into the
17    bathroom, therefore I could not see her. When she came out of
18    the bathroom she told me she was going to the café to get an
19    herbal tea that would help her to rest. I then fell asleep."
20 (Mot. for Summ. J., Ex. R at 4 (emphasis added).)
21     A toxicology report prepared as part of the autopsy revealed that
22 Kanesaki had not ingested the sleeping pills found in the cabin. Report
23 of Dean A. Hawley, M.D. ("Hawley Decl.") at 3.) However, as noted by
24 Claimants, this was not inconsistent with Kocontes's statements that
25 he did not know whether Kanesaki had taken the pills before her
26 disappearance.
27     Regarding the issue of whether Kanesaki had consumed wine, the
28 autopsy does not indicate whether a test for the presence of alcohol

in Kanesaki's blood was performed. (Hawley Decl. at 3.) Accordingly, there is also no inconsistency between Kocontes's statement that Kanesaki drank wine prior to her disappearance and the autopsy report. Furthermore, the Italian police reports contain a statement from a waiter who served Kocontes and Kanesaki a bottle of wine at dinner on the evening of Kanesaki's disappearance. The waiter stated that Kocontes and Kanesaki each had a glass of wine at dinner, and took the unfinished bottle with them when they left the dining room. (Mot. for Summ. J., Ex. R at 8.)

The Government has not offered any evidence to rebut Claimants' evidence demonstrating that there were no inconsistencies between Kocontes's statements and the autopsy findings. *See Celotex Corp.*, 477 U.S. at 322-23. Accordingly, there is no genuine issue of material fact as to whether Kocontes made inconsistent statements to investigators.

### 5. Financial Motive

The Government argues that Kocontes wanted to obtain Kanesaki's assets, and that this provided the motive for him to commit murder. The Government maintains that Kanesaki was independently wealthy, but that the exact amount of her wealth is ultimately irrelevant, as it is undisputed that Kocontes acquired at least $450,000 as the result of her death. (Opp. at 20-24.) Claimants maintain that Kanesaki was not independently wealthy, and that the fact that Kocontes inherited money upon Kanesaki's death does not create a triable issue of fact as to whether Kocontes murdered Kanesaki. (Am. Mem. in Supp. of Summ. J. at 18-23.)

#### a. Relevant Evidence

##### (1) Claimants' Financial Evidence

As evidence demonstrating the absence of a triable issue of fact

16

as to whether Kanesaki was independently wealthy, Claimants offer the declaration of Kocontes, which details his knowledge of Kanesaki's assets and the basis for that knowledge. Kocontes states that up until 1997, when Kanesaki stopped working at the law firm where they met, Kanesaki was making approximately $40,000 per year. (Kocontes Decl. at 2.) Kocontes had reviewed and signed Kanesaki's tax returns for 1996 and 1997, which confirmed she was making that amount for those years. Kanesaki stopped working at the law firm in 1997, and from 1998 until her death, her primary source of regular income was disability insurance, from which she received approximately $2,745.42 per month. (*Id.*)

Kocontes explains that at the time of his marriage to Kanesaki, she had partial ownership in one parcel of real property, and that this was the only substantial asset, real or personal, owned by Kanesaki. (*Id.*) Kanesaki had purchased the property jointly with her brother and his wife, and contributed approximately $11,000 to the down payment amount, making her equity interest approximately $10,000 at the time of purchase in 1994. (*Id.* at 3.) After their marriage, Kocontes was added to the grant deed upon a payment of $12,500, at the same time the home was refinanced. After refinancing, Kanesaki and Kocontes each had a $12,500 interest out of the $50,000 total equity in the home. (*Id.*) Claimants have included the relevant deeds confirming this information. (2011 Supp. Decl. of Kocontes, Ex. O.) Once married, the couple acquired additional property, but most of the funds came from Kocontes's separate property and earnings. (Kocontes Decl. at 3-5.)

Kocontes states that at the time of his marriage to Kanesaki, his separate net worth was approximately $250,000. (*Id.* at 3.) Kocontes earned more than $100,000 per year as an attorney between 1995 and

17

2006. During this same time period, Kanesaki contributed at most 20 percent of the funds deposited in their joint accounts and used to acquire jointly held assets. In 2006, the couple's jointly held assets had grown to over a million dollars total. (*Id.* at 5.)

Kocontes also stated that from the time of the couple's divorce to the time of Kanesaki's death, the couple maintained joint financial accounts with a right of survivorship. The bulk of the money that funded these accounts was Kocontes's separate property funds. Kocontes had full access to withdraw funds from these accounts at any time, and his access did not depend on Kanesaki's death. (Supp. Decl. of Kocontes at 2.) Kocontes also stated that he was not aware of any trust fund that ever existed for Kanesaki's benefit, and did not take control of any trust fund belonging to Kanesaki following her death. (Kocontes Decl. at 12.)

### (2) The Government's Financial Evidence

To rebut Claimants' evidence and demonstrate that Kanesaki was, in fact, independently wealthy, the Government provides the declaration of Frank Bernal, an FBI agent, along with exhibits ("Bernal Decl."). Bernal states that his declaration is based on personal knowledge, as well as based on a review of FBI records, translated Italian government records, and bank records. (Bernal Decl. at 1.) According to Bernal, Kanesaki was a millionaire at the time she married Kocontes based on financial investments and her ownership of several pieces of real property. (*Id.* at 2.) Following Kanesaki's death, Kocontes obtained full control over: (1) Kanesaki's trust fund; (2) a Citibank account held jointly by Kanesaki and Kocontes ; (3) other bank accounts held jointly by Kanesaki and Kocontes; and (4) other assets owned by Kanesaki. (*Id.* at 2-3.)

1       Attached to the Bernal Declaration is five exhibits. The first is
2   an email dated March 2, 2005, from Kanesaki to Sue White, Kanesaki's
3   former co-worker at the law firm where she was working when she met
4   Kocontes. In the email, Kanesaki stated she was unhappy with Kocontes,
5   and then on the subject of finances, she wrote:

6       After the past few weeks of arguing with LK [Kocontes],
7       I have decided to cut-off his access to my parents' money. He
8       even tries to control their money. You know they asked me to
9       hold on to it and I can use it for safer investments. They
10      know that the amount of money they have may not last for the
11      rest of their lives, so they moved into that retirement place
12      because they don't want to burden me-and asked me to
13      hold/utilized the money for their and my benefit. I'll be
14      dammed if I'm going to let LK tell me how I should
15      invest/spend my parents' money. He tells me, we should invest
16      it so we can have more money when we retire. Yeah right, you
17      mean so he can have more money and access to my parents'
18      money???!!!

19      I really understand why you and many others keep their
20      money separate from their spouses. Money and infidelity = No.1
21      reasons for marriage dissolution.

22      You know, I can't even buy any big ticket items because
23      LK doesn't want to spend the money-and we can afford it and we
24      would be paying cash. Spending the money doesn't affect our
25      financial ability to save for our future, or meet our expenses
26      in life. He just cant part with the $$ because it would
27      decrease the balance. I have to put up a big fights/arguments
28      before I can buy anything for my house. The fighting takes all

1     the fun out of my home projects. . . ."

2 (Bernal Decl, Ex. C at 3-4.)

3     The other four exhibits are FBI Form 302s, which contain interview

4 notes from FBI interviews conducted with four individuals. All four of

5 the interviews took place in May or June of 2006, shortly after

6 Kanesaki's death. The first was with Sue White. (Bernal Decl., Ex. D.)

7 The Form 302 indicates that White characterized Kanesaki as being

8 wealthy and that she stated that Kanesaki had done very well as a day

9 trader. White stated that she was aware that Kanesaki had separated her

10 assets from Kocontes and established a trust fund for her parents, and

11 that White had provided Kanesaki with a name of an attorney that might

12 be able to help her separate her assets. Interestingly, White believed

13 that Kanesaki and Kocontes were still married. (*Id.*)

14     The second Form 302 contains interview notes with Amporn

15 Amatayakul, who appears to be the current wife of Kanesaki's former

16 brother-in-law. According to the notes:

17     "Amatayakul was aware that Kanesaki had a lot of money.

18     Amatayakul believes that Kanesaki did well investing in oil

19     and stocks on the internet. Amatayakul also believed that

20     Kanesaki owned three homes. Amatayakul stated that Kocontes

21     was always after Kanesaki's money, and that Kocontes wanted

22     Kanesaki to live more frugally. . . . Amatayakul said that

23     during their last separation, Kanesaki had hired an

24     attorney for approximately $16,000 to help her separate her

25     assets from Kocontes."

26 (Bernal decl, Ex. E.)

27     The third Form 302 contains notes from an interview with Apiruks

28 Amatayakul, Kanesaki's former brother-in-law. Kanesaki lived with

Apiruks and his wife Amporn while she was separated from Kocontes in 2005. Apiruks was aware that Kanesaki had hired an attorney to separate her financial accounts from Kocontes. According to the interview notes:

> "Amatayakul stated that the home that Kocontes and Kanesaki had lived in in Ladera Ranch, California was completely in Kanesaki's name, and that Kocontes wanted half of the money for the home. Kanesaki told Amatayakul that well [sic] they were separated she paid Kocontes a couple of million dollars. Amatayakul was also aware that Kanesaki had two or three rental properties that she derived income from."

(Bernal Decl, Ex. F.) Apiruks also stated that during one of the days that Kanesaki was visiting their home in early May 2006, she checked her investment accounts on his computer and Apiruks observed that she had $2 to $3 million dollars in one of these accounts. (*Id.*)

The final Form 302 contains notes from an interview with Julie Saranita, Kanesaki's niece and the daughter of Apirkus Amatayakul and Kanesaki's sister. Saranita stated she believed Kanesaki's disability insurance monthly payments were significant, and possibly as much as $4,000 or $5,000. Additionally, Kanesaki "went to classes on the stock market and was successful in compiling liquid assets of at least 2 million." In 2005, Kanesaki retained an attorney to ensure her assets were separated from Kocontes's assets. Saranita stated their Ladera Ranch home was listed in the names of both Kocontes and Kanesaki. (Bernal Decl., Ex. G.)

### b. Admissibility of the Government's Financial Status Evidence

While Bernal's statements as to Kanesaki's wealth are not based on personal knowledge, the Government contends that the Bernal

Declaration references exhibits that contain admissible evidence of Kanesaki's wealth, and that therefore this evidence should be considered in opposition to the motion for summary judgment. (Government's Response to Claimant's Evidentiary Objections ("Response") at 3 (citing *Fraser*, 342 F.3d at 1036).) It argues that the email from Kanesaki can be introduced under a hearsay exception, and that the contents of the Form 302s will be admissible either through a hearsay exception or through witnesses who can testify at trial. (Response at 3, 11.) The government's admissibility arguments are without merit.

### (1) Kanesaki's Email

The Government argues that Kanesaki's email can be introduced under either: (1) the "forfeiture by wrongdoing" exception to the hearsay rule, or (2) the "state of mind" exception. (Response at 4.) Federal Rule of Evidence 804(b)(6) provides a hearsay exception for "[a] statement offered against a party that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result." In determining whether Rule 804(b)(6)'s exception is applicable, courts have generally used the preponderance of the evidence standard, though some have indicated that the higher clear and convincing evidence standard may apply instead. *See, e.g., Hodges v. Attorney General, Florida*, 506 F.3d 1337, 1345 n.1 (11th Cir. 2007) (recognizing that preponderance of the evidence is the appropriate standard); Advisory Committee Notes to Fed. R. Evid. 804(b)(6), 1997 Amendments ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage."); *but see United States v. Baskerville*, 448 Fed. Appx. 243, 250 n. 4, 2011 WL 4850257, at *6 n.4

(3d Cir. 2011) (declining to decide the appropriate evidentiary standard for admitting statements pursuant to Rule 804(b)(6) and noting that "[u]nder either a clear and convincing evidence standard or a preponderance of the evidence standard, the Government's showing sufficed."). Accordingly, the question of whether Kanesaki's email can be admitted is the same as the ultimate issue of this forfeiture action-whether the Government can establish, by a preponderance of the evidence, that Kocontes murdered Kanesaki. The Government may not use the circular argument that Kanesaki's email is evidence that Kocontes murdered Kanesaki, and that the email is admissible because of the same.

Under Fed. R. Evid. 803(3), a statement of an out-of-court declarant's then-existing state of mind, including intent, is not excluded by the hearsay rules. Here, the Government argues that the email, which expresses Kanesaki's intent to cut off Kocontes's access to her parent's trust fund, is admissible under the state of mind exception to show that Kanesaki did, in fact, cut him off from the money. (Response at 4.) However, the question of whether Kanesaki did cut him off from her parents' trust fund is not relevant here. The Government's argument that "such a deprivation of access would have given Kocontes a financial motive for murder" is wholly speculative. There is no evidence that Kocontes either obtained or tried to obtain access to this trust fund following Kanesaki's death. Furthermore, statements by Kanesaki about the reasons for her decision to cut off Kocontes are not admissible under the state of mind hearsay exception. *See Wagner v. Conty. of Maricopa*, 673 F.3d 977, 987 (9th Cir. 2012) (finding that "statements ... offered to show not only that [individual] was agitated ... but also why he was agitated" were

23

hearsay not permitted by Rule 803(3)); *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987) (state of mind exception does not permit witness to relate statements as to why he had particular state of mind). Thus, even if the single line in the email that Kanesaki had "decided to cut-off his access to my parents' money" was admissible under this exception, the remainder of the email is not.

### (2) Form 302s

The Government argues that the contents of the Form 302s are admissible because either: (1) the statements have sufficient "circumstantial guarantees of trustworthiness" to fall under the residual hearsay exception of Fed. R. Evid. 807, or (2) the witnesses identified in the Form 302s will be available to testify at trial. (Response at 6, 11.)

The Government has failed to show that Rule 807's residual hearsay exception is applicable here. This exception is only applicable if the statement sought to be admitted "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). Here, the Government has not argued, much less demonstrated, that more probative evidence as to Kanesaki's financial status is not available through reasonable efforts. It has not explained why six-year-old speculative hearsay statements from several of Kanesaki's acquaintances and family members should be relied upon instead of documents such as financial records, property deeds, or tax returns that could reliably demonstrate Kanesaki's assets. Furthermore, it has not convincingly shown that the consistency between the statements of four individuals (three of whom belong to the same family) constitutes an "equivalent circumstantial guarantee[] of trustworthiness" to other specifically covered hearsay

24

1    exceptions.[6] *See* Fed. R. Evid. 807(a).

2         Moreover, the Government's contention that the individuals

3    identified in the Form 302s will be available to testify at trial is

4    not sufficient to render the relevant contents of the Form 302s

5    admissible evidence. Fed. R. Civ. P. Rule 56, which governs motions for

6    summary judgment, requires that a "declaration used to support or

7    oppose a motion must be made on personal knowledge, set out facts that

8    would be admissible in evidence, and show that the affiant or declarant

9    is competent to testify on the matters stated." Fed. R. Civ. P.

10   56(c)(4). For the statements to be admissible on summary judgment, the

11   declaration itself must make clear how the declarants know the facts

12   they assert and are competent to testify about them. *See Shakur v.*

13   *Schriro,* 514 F.3d 878, 890 (9th Cir. 2008) ("'[C]onclusory affidavits

14   that do not affirmatively show personal knowledge of specific facts are

15   insufficient.'") (quoting *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir.

16   1993)).

17        The Form 302s, for the most part, contain statements of opinion

18   regarding Kanesaki's wealth and her relationship with Kocontes.

19   Neither the forms themselves, nor any other evidence provided by the

20   Government, identifies admissible evidence supporting these opinions

21   that would render the opinions themselves admissible. Rather, the

22   opinions are either conclusory or appear to be generally based on

23   inadmissible hearsay statements from Kanesaki herself.

24

25        [6] This is particularly true in light of inconsistencies and
     undisputed errors within the Form 302s. For example, Sue White states
26   that she believed that Kanesaki and Kocontes were still married, when
     it is undisputed that Kocontes and Kanesaki's divorce was finalized.
27   (Bernal Decl., Ex. C). Apiruks Amatayakul stated that the couple's
     Ladera Ranch property was completely in Kanesaki's name, while Julie
28   Saranita stated that the Ladera Ranch home was listed under the names
     of both Kocontes and Kanesaki. (Exs. F, G.)

Here, Claimants have offered a detailed declaration from Kocontes regarding Kanesaki's assets. The declaration is based on Kocontes's personal knowledge as Kanesaki's spouse and partner, as well as reliable documents such as tax returns and property deeds. Having met their initial burden of demonstrating the absence of a genuine issue of material fact on this issue, it was the Government's burden to produce enough evidence to show that a triable issue of fact remains. *See Celotex Corp,* 477 U.S. at 322-23. Yet despite its reliance on Kocontes's alleged financial motive for murder as one of the key elements of its case, the Government offers only six-year-old interview notes on Form 302s to rebut Claimants' testimonial and documentary evidence as to Kanesaki's assets. The Government has not explained its failure to submit declarations from the individuals identified in the Form 302s, nor indicated that they have even been contacted since the original interviews took place more than six years ago. More importantly, the Government has produced no documentary evidence, such as deeds, tax returns, or financial records, to demonstrate that Kanesaki was independently wealthy. Accordingly, the Government has not produced sufficient evidence to create a triable issue of fact as to whether Kanesaki was independently wealthy and whether Kocontes obtained, or even stood to obtain, more than $500,000 as the result of her death.

### 6. Analysis of the Government's Circumstantial Evidence

The admissible evidence supporting the Government's argument that a genuine issue of material fact exists as to whether Kocontes murdered Kanesaki consists of: 1) the undisputed fact that Kocontes was present on the cruise ship, along with the more than 2,000 passengers and crew members also on board, and 2) the fact that Kocontes acquired between

$450,000 and $500,000 as the result of Kanesaki's death, and 3) the fact that Kocontes and Kanesaki had a troubled relationship. The Court must determine if, based on these facts, a genuine issue of material fact exists as to whether Kocontes murdered Kanesaki.

Kocontes's presence on the ship, his acquisition of Kanesaki's share of their jointly held property, and the up-and-down nature of the couple's relationship are simply insufficient to meet the Government's burden. Kocontes's presence on the ship at the time of Kanesaki's disappearance made him as likely as any one of more than 2,000 other individuals to have committed the murder. His presence does not provide strong circumstantial evidence that he was the perpetrator.

While the acquisition of nearly $500,000 in assets may be evidence of a motive to kill under some circumstances, here Kocontes' accumulation of the assets occurred in the context of a 10-year relationship and marriage to Kanesaki.[7] Additionally, Kocontes had access to a substantial portion of these assets while Kanesaki was alive. (*Supp. Decl of Kocontes,* at 2.) In short, the fact that Kocontes received assets, most of which were joint property, as the result of the death of his partner and former spouse is not compelling circumstantial evidence that he committed murder.

Finally, while the relationship was troubled, with apparent disputes over finances and an intervening divorce, there is nothing arising from the relationship which would give rise to an inference that Kocontes murdered Kanesaki. The violence in the relationship

---

[7] While the Bernal Declaration states that Kocontes "obtained control over [] Kanesaki's trust fund," (Bernal Decl. at 2-3), the Government has provided no admissible evidence to rebut Kocontes's statement that either no such fund existed, or if it did, Kocontes was not aware of it and never took control of it. (Kocontes Decl. at 12.)

1   appears to be minimal and all of it was attributable to Kanesaki.

2       While suspicion naturally would focus on the domestic partner in

3   a case such as this, suspicion is not enough to survive summary

4   judgment. When all is said and done, the government has presented

5   nothing more than allegations and speculation to support its claim that

6   Kocontes murdered Kanesaki, which is insufficient to create a genuine

7   issue of material fact. *Nelson*, 83 F.3d 1081-82. Under these

8   circumstances, Claimants' motion for summary judgment must be granted.

9

10  **IV.   Conclusion**

11      For the foregoing reasons, Claimants' motion for summary judgment

12  is GRANTED. IT IS ORDERED that judgment be entered dismissing the

13  action with prejudice.

14

15  Dated: November 20, 2012

16

17

18                                    MARC L. GOLDMAN
                                      _____
19                                    Marc L. Goldman
                                      United States Magistrate Judge
20

21

22

23

24

25

26

27

28